*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

In re:  GERALD WINGERTER and JANET G.
KELLER-WINGERTER,

*Debtors.*

――――――――――――――――――――――

B-LINE, LLC,

*Appellant,*

*v.*

GERALD A. WINGERTER and JANET G.
KELLER-WINGERTER,

*Appellees.*

No. 08-4455

――――――――――――

On Appeal from the Bankruptcy Appellate Panel.
No. 06-50120—Marilyn Shea-Stonum, Bankruptcy Judge.

Argued:  December 4, 2009

Decided and Filed:  January 25, 2010

Before:  SILER, GILMAN, and ROGERS, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:**  Linh K. Tran, Seattle, Washington, for Appellant.  **ON BRIEF:**  Linh K. Tran, Louis H. Treiger, Seattle, Washington, for Appellant.

GILMAN, J., delivered the opinion of the court, in which SILER, J., joined. ROGERS, J. (pp. 15-21), delivered a separate dissenting opinion.

―――――――――――

## OPINION

―――――――――――

RONALD LEE GILMAN, Circuit Judge.  B-Line, LLC purchased a creditor's claim against Gerald Wingerter and filed a proof thereof in the Chapter 13 bankruptcy of

1

Wingerter and his wife Janet G. Keller-Wingerter. This claim was purchased from an intermediary that was not the original creditor, although the intermediary had warranted to B-Line that the claim was valid. The proof of claim did not include copies of the originating documents or contain an explanation of why copies of the originating documents were unavailable. When the Wingerters challenged the proof of claim, B-Line withdrew the same after it was unable to document the claim's validity.

After a series of hearings, the bankruptcy court determined that B-Line had violated Rule 9011(b) of the Federal Rules of Bankruptcy Procedure by filing its proof of claim without supporting documents or an explanation of why such documents were unavailable. B-Line appealed to the Bankruptcy Appellate Panel (BAP), which dismissed the appeal on procedural grounds. For the reasons set forth below, we **REVERSE** the decisions of both the BAP and the bankruptcy court.

## I. BACKGROUND

B-Line is a business entity that specializes in purchasing "consumer bankruptcy debt." It purchases such debt from both original creditors and intermediaries. B-Line then files proofs of claim in the respective debtors' bankruptcy cases, or has existing proofs of claim transferred to it.

When B-Line purchases a claim, it does not acquire the supporting documentation. Instead, it requests several pieces of information from the claim's seller that B-Line stores in an electronic database. This information typically includes the debtor's name, address, contact information, and Social Security number, as well as the original account number, the original creditor's name, the original amount owed, the date the original account was opened, and the bankruptcy case information.

B-Line relies on the sellers from whom it purchases the claims to provide accurate, truthful information, and it negotiates a purchase agreement with these sellers to protect itself in case a seller misrepresents the validity of a claim. The purchase agreement requires, in particular, a warranty that each claim sold to B-Line "represents a legal, valid and binding obligation of the related Debtor." To keep down its costs, B-Line does not request copies of a claim's originating documents unless a debtor challenges the claim.

With regard to the Wingerters' bankruptcy case, B-Line purchased a claim against them from Covenant Management, LLC. The claim allegedly originated with the former business entity GTE and was in the amount of $431.57. B-Line filed a proof of claim for the $431.57 in the Wingerters' Chapter 13 bankruptcy case. The Wingerters had not acknowledged a debt to GTE or scheduled the payment of a claim for that amount.

B-Line's proof of claim was submitted on Bankruptcy Form 10, but that form was not filled out completely. Specifically, the Form 10 lacked information about whether the claim included interest charges in addition to the principal and, as B-Line admits, incorrectly stated that the basis of the claim was "money loaned." In addition, B-Line did not supplement the Form 10 with any supporting documents that demonstrated the origins of its claim, but instead attached a printout from its electronic database with various pieces of information. This information included Mr. Wingerter's name, the last four digits of his Social Security number, an address, the amount of $431.57, and four digits of a "related account number."

After the Wingerters filed an objection to B-Line's proof of claim, the bankruptcy court set a date for a hearing. B-Line then attempted to find copies of the alleged originating documents that showed a debtor-creditor relationship between GTE and Mr. Wingerter, but was unable to do so. As a result, B-Line withdrew its proof of claim.

The bankruptcy court subsequently issued a series of orders directing B-Line to explain both its business practices generally and its handling of the GTE claim against the Wingerters in particular. This resulted in a series of evidentiary hearings before the bankruptcy court, supplemented by evidentiary submissions and briefs.

The bankruptcy court ultimately issued an opinion sanctioning B-Line for failing to comply with Rule 9011(b) of the Federal Rules of Bankruptcy Procedure. Rule 9011 provides in pertinent part as follows:

(b) Representations to the court

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's

knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

. . .

> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Bankr. P. 9011(b)(3). In its opinion, the court found that B-Line had failed to make a "reasonable pre-filing inquiry" that the claim was valid and supported by the evidence. This purported failure violated Rule 9011(b)'s requirement that any filing with a bankruptcy court be based on "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Specifically, the bankruptcy court ruled that any party filing a proof of claim on an unscheduled claim must include copies of "originating documents" or, when such documents are unavailable, an affidavit explaining the absence of such documents.

The bankruptcy court then stated that "[b]ecause of the time and energy that B-Line's senior management devoted in response to this Court's show cause order, however, the Court does not view any further sanctions to be necessary in this case." But the court did opine that proceeding as B-Line did in the present case violates Rule 9011(b), that creditors should avoid doing so, and that such proofs of claim should be filed with supporting documents (or with an explanation for their absence) in the future. This opinion, which is published, has been cited by other bankruptcy courts and at least one bankruptcy appellate panel.

As B-Line explains, the bankruptcy court's order essentially prohibits B-Line's current business practice of relying on account information and not seeking out copies of a claim's originating documents unless and until a debtor objects to the proof of claim. Complying with this order will significantly increase B-Line's cost of doing business.

B-Line appealed the bankruptcy court's order to the BAP, which affirmed in a 2-to-1 decision. The BAP majority determined that B-Line was appealing two distinct issues: (1) the bankruptcy court's determination that B-Line violated Rule 9011(b), and (2) the bankruptcy court's warning that B-Line and other entities not engage in similar behavior in the future. On the Rule 9011(b) violation, the BAP concluded that the issue was moot because the bankruptcy court imposed no monetary sanctions on B-Line. The BAP also

determined that addressing the second issue was unnecessary because the warning was "not final" and because deciding the matter would, in any event, require the BAP to render a constitutionally prohibited advisory opinion. For these procedural reasons, the BAP never substantively addressed the bankruptcy court's holding that B-Line violated Rule 9011(b) and thereby engaged in sanctionable conduct. The dissenting member of the BAP, on the other hand, concluded that B-Line's appeal was not moot and that its proof of claim had not violated Rule 9011(b). This appeal followed.

## II. ANALYSIS

### A.    Standard of review

In a bankruptcy appeal, we independently review the decision of the bankruptcy court that has been appealed to the BAP. *Tidewater Fin. Co. v. Curry* (*In re Curry*), 509 F.3d 735, 735 (6th Cir. 2007). The bankruptcy court's findings of fact are reviewed under the clear-error standard, and its conclusions of law are reviewed de novo. *Behlke v. Eisen* (*In re Behlke*), 358 F.3d 429, 433 (6th Cir. 2004).

We review the bankruptcy court's imposition of sanctions using the abuse-of-discretion standard. *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 711 (6th Cir. 1999). An abuse of discretion occurs where the reviewing court has "a definite and firm conviction that the court below committed a clear error of judgment." *Barlow v. M.J. Waterman & Assocs., Inc.* (*In re M.J. Waterman & Assocs., Inc.*), 227 F.3d 604, 607-08 (6th Cir. 2000) (citation, alterations, and internal quotation marks omitted). "The question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." *Id.* at 608.

### B.    Mootness

We will first address the issue of mootness, which was the basis of the BAP's decision to dismiss B-Line's appeal. The BAP generally concluded that B-Line's appeal was both moot and that B-Line was requesting an impermissible advisory opinion. We respectfully disagree with both conclusions.

To begin with, the BAP analyzed the potential mootness of B-Line's appeal by splitting the bankruptcy court's ruling into two parts—its holding that B-Line's conduct violated Rule 9011(b) and was sanctionable, and its admonition that B-Line and other parties should not engage in similar activity in the future.  No legal authority was cited in support of the BAP's dual method of analysis, and we view its division of the bankruptcy court's decision as unwarranted.  The bankruptcy court's warning to future parties simply extrapolated the holding of its opinion, saying the equivalent of "if any future party before this court engages in the exact same behavior as the present party, you should expect the same result."  Such an admonition is implied in any ruling, so simply including it in the present case does not create a two-tiered holding.

Turning to the substance of the mootness issue, we find that the opinion of the dissenting BAP judge is more persuasive than the opinion of the BAP majority, and thus conclude that the present appeal is not moot.  Mootness is an extension of the U.S. Constitution's requirement of standing—the "irreducible constitutional minimum" needed to make a justiciable case or controversy. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In practical terms, the standing requirement limits federal courts to addressing "only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  "Mootness results when events occur during the pendency of a litigation which render the court unable to grant the requested relief." *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986).  A court determines whether a case is moot "by examining whether an actual controversy between the parties exists in light of intervening circumstances." *Fleet Aerospace Corp. v. Holderman*, 848 F.2d 720, 723 (6th Cir. 1988).

In the present case, the original "controversy" was whether the claim that B-Line asserted against the Wingerters was valid.  B-Line eventually withdrew its proof of claim, however, so the new "controversy"—initiated sua sponte by the bankruptcy court—became whether B-Line's conduct violated Rule 9011(b) and was sanctionable.  Because no monetary sanctions were imposed, the BAP majority concluded that B-Line's appeal was moot, as does our dissenting colleague.  Specifically, the dissent finds that the bankruptcy court's only holding was that B-Line merited no sanctions, and that any other conclusion was merely "dictum." (Dissenting Op. at 15-16)  We respectfully disagree.

To the contrary, we find that the bankruptcy court's holdings are encapsulated in its bolded heading that "B-Line Violated Rule 9011 in the Present Case" and, as its "[no] further sanctions [are] necessary" language indicates, its determination that B-Line's conduct was sanctionable. At least one other court has similarly interpreted the bankruptcy court's opinion. *See In re Pearce*, 411 B.R. 303, 308 (Bankr. E.D. La. 2008) (explaining that the bankruptcy court in the present case "held" that actions like B-Line's failed to fulfill a creditor's obligations under Rule 9011); *see also Rogers v. B-Real, LLC* (*In re Rogers*), 391 B.R. 317, 323 (Bankr. M.D. La., 2008) (citing the bankruptcy court's opinion as support for the proposition that "Rule 9011 can be used to sanction a creditor that . . . violates [that rule]."). In our opinion, therefore, a distinct "controversy" exists with significant, serious consequences for B-Line—whether, as the bankruptcy court held, its normal business practices are so out-of-line with federal procedure as to subject the company to sanctions.

Reviewing other appeals of nonmonetary sanctions illustrates the point. For example, the dissenting BAP judge compared the present case to the decision of the United States Court of Appeals for the First Circuit in *Sterling Consulting Corp. v. Internal Revenue Service* (*In re Indian Motocycle Co., Inc.*), 452 F.3d 25 (1st Cir. 2006). In that case, the district court concluded that the IRS had deliberately made meritless arguments in an effort to delay the proceedings. It declared that the IRS's conduct was unacceptable and sanctionable, but did not impose any specific penalty. *Id.* at 27.

Even though the underlying case settled during briefing, the IRS pressed its appeal of the sanctions ruling. The First Circuit held that the IRS's appeal was not moot because "the sanction[s] order continues to have a potential real-world impact upon the [IRS.]" *Id.* at 30. It explained that the IRS regularly engaged in the behavior addressed by the district court, and that the court had essentially held that "the regular practice of the IRS, an institutional litigant, amounts to willful misconduct that invites penalties." *Id.* The First Circuit concluded by "hold[ing] that foreseeable practical consequences give the IRS adequate and justifiable incentive to litigate these appeals and that the government has Article III standing to proceed." *Id.*

Like the dissenting BAP judge, we find the First Circuit's analysis persuasive. As the dissenting judge explained, B-Line's behavior "was not an idiosyncratic event" but was

in fact the entity's "customary business practices," and that the bankruptcy court "was issuing a formal ruling that these [practices] are sanctionable." The present case thus closely resembles the IRS's situation in *Sterling*. Moreover, the sanctions orders appealed by B-Line and the IRS are quite different from a ruling that an isolated act by an infrequent litigant, such as a rude outburst, is sanctionable conduct. In the latter situation, the sanctioned party suffers no real ramifications in the absence of a monetary penalty because of the remote likelihood that the party will engage in the offensive behavior again. But with a repeat litigant like B-Line, whose core business practices have been held to be sanctionable, there are serious, harmful consequences.

Our dissenting colleague, however, believes that a key difference exists between the present case and *Sterling* because the lower court's decision in that case was "expressly identified as a reprimand," whereas B-Line was not expressly reprimanded by the bankruptcy court. (Dissenting Op. at 19-20) We again respectfully disagree. The bankruptcy court's entire opinion is devoted to highlighting B-Line's alleged violation of Rule 9011(b) of the Federal Rules of Bankruptcy Procedure, criticizing B-Line for its business practices, and admonishing it to change those practices. As such, we believe that the bankruptcy court's failure to expressly use the word "reprimand" is a distinction without a difference.

Another comparison is instructive with regard to the question of mootness. In several circuits, there is a general rule that an attorney subjected to a nonmonetary sanction may appeal if the sanction "affect[s] an attorney's professional reputation." *Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163, 1167-68 (10th Cir. 2003) (collecting cases). This rule exists because, like B-Line and the IRS, attorneys who appear frequently before the courts would find their reputations and business interests harmed by a declaration that their behavior was sanctionable.

Such a declaration, even where no monetary sanctions are imposed, has been held to be "a legally sufficient injury to support appellate jurisdiction." *Id.* at 1167; *see also Bowers v. NCAA*, 475 F.3d 524, 542-44 (3d Cir. 2007) (holding that attorneys whose behavior was declared sanctionable could appeal despite not receiving "any additional monetary or disciplinary sanctions . . . beyond factual findings and language in the actual

order that the conduct of those attorneys merited sanctions"); *Walker v. City of Mesquite*, 129 F.3d 831, 832-33 (5th Cir. 1997) (holding that "the importance of an attorney's professional reputation, and the imperative to defend it when necessary, obviates the need for a finding of monetary liability or other punishment as a requisite for the appeal of a court order finding professional misconduct").

Compared to the somewhat vague injury to "reputation" suffered by sanctioned attorneys, which has the potential to harm their economic interests, B-Line's injury is more direct and certain because part of the company's core business practices has been declared sanctionable. B-Line's business is thus thrown into uncertainty, either forcing the company to comply with the bankruptcy court's more stringent (and more expensive) filing requirements or placing it at risk of being sanctioned in bankruptcy courts throughout the country. The court's sanctions order, therefore, has caused direct, financial injury to B-Line. Under these particular circumstances, B-Line's appeal of the court's sanctions order is not moot.

## C.     Violation of Rule 9011(b)

The bankruptcy court determined that the manner in which B-Line submitted its proof of claim violated the requirements of Rule 9011(b) of the Federal Rules of Bankruptcy Procedure. This determination was based on two primary factual findings: (1) that B-Line filed a proof of claim without ever acquiring or attempting to acquire copies of the originating documents, and (2) that B-Line never received any representation or warranty from the prior owner of the claim that the claim was valid and enforceable. Although B-Line admits that the first factual finding is correct, it disputes the second, and insists that its purchase agreement with Covenant contains warranties that the claims it bought are valid. We first address this factual dispute before turning to the bankruptcy court's analysis of Rule 9011(b).

### 1.     *B-Line did receive warranties about the validity of claims purchased from Covenant*

At the beginning of its opinion, the bankruptcy court made a series of factual findings. One of these includes the following statement: "The Court finds, however, that there is no representation or warranty in the Covenant/B-Line Forward Flow Agreement as

to the validity or enforceability of the claims summarized in the data transmitted from Covenant to B-Line." Our review of the record demonstrates that this factual finding is clearly erroneous.

As explained by B-Line, the "Forward Flow Agreement" is part of a standard purchase agreement—a contract that B-Line negotiates with claim owners before conducting business with them. All purchases thus occur within the framework of the purchase agreement. The particular purchase agreement between B-Line and Covenant in this case provides that "[a]s of the Closing Date . . . [Covenant] has used reasonable efforts in accordance with industry standards to create Computer Files which set forth each Account designated in the Term Agreement, each of which meets the Eligibility Requirements as of the Cut-Off Date." Covenant therefore warranted, as part of the purchase agreement, that each "Account" sold to B-Line met "the Eligibility Requirements." "Eligibility Requirements" are defined in the purchase agreement as "the requirements set forth in Paragraph 9.1 through 9.9 with respect to each account." Notably, Paragraph 9.4 requires that "the Account represents a legal, valid and binding obligation of the related Debtor," while Paragraph 9.1 mandates that "the debt is not disputed by the Debtor or Trustee" and that "no proof of claim has been or will be rejected or successfully objected to by any person." As the dissenting BAP judge put it, "[t]hus, there were explicit representations and warranties from Covenant that the accounts purchased by B-Line were valid obligations of the account debtors."

The bankruptcy court, therefore, clearly erred in finding that the purchase agreement between B-Line and Covenant did not contain representations about the validity of the claims purchased by B-Line. There is explicit, undisputed evidence in the record to the contrary.

### 2.    *The reasonableness of B-Line's prefiling inquiry*

The bankruptcy court also found that B-Line violated Rule 9011(b) because the company did not make a "reasonable inquiry" into the basis of its claim against the Wingerters before filing its proof of claim. *See* Fed. R. Bankr. P. 9011(b)(3). Violations of Rule 9011(b) are punishable by sanctions. Fed. R. Bankr. P. 9011(c). "The test for imposing sanctions [under Rule 9011(b)] is whether the individual's conduct was reasonable under the

circumstances." *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 711 (6th Cir. 1999). "In applying this test, the bankruptcy court is not to use the benefit of hindsight but should test the signer's conduct by inquiring what was reasonable to believe at the time the [filing] was submitted." *Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472, 481 (6th Cir. 1996) (alterations, citation, and internal quotation marks omitted).

The bankruptcy court, therefore, should have considered all of the relevant circumstances at the time B-Line filed its proof of claim. Instead, the court primarily focused on its factual findings that B-Line had not only never seen the originating documents for the claim, but also had never received any warranty from Covenant that the claim was valid. As explained above, this latter factual finding was clearly erroneous.

Furthermore, the record demonstrates that, by relying on these warranties from Covenant, B-Line was acting in a reasonable manner. B-Line submitted evidence at the evidentiary hearings that it had been purchasing claims from Covenant for roughly two years before it filed the proof of claim in the Wingerters' case. During this time, B-Line filed 1,017 proofs of claim based on purchases from Covenant. Only five were ever disputed. One of the five was the claim in the present case, and three of the other four disputed proofs of claim were resolved in B-Line's favor. Thus, only 2 out of 1,017 claims (less than two-tenths of one percent) were found to be invalid. As such, there was a strong, consistent track record of Covenant providing enforceable claims to B-Line at the time that B-Line filed the proof of claim in the Wingerters' case.

The bankruptcy court also failed to consider evidence presented at the evidentiary hearings showing that Covenant had conducted its own investigation into the claim at issue. Specifically, B-Line presented evidence that Covenant bought the Wingerter claim from a third party, Professional Recovery Systems, LLC, from which Covenant had successfully purchased claims before. Covenant then researched the origins of the claim, subcontracting with a collection agency that contacted Mr. Wingerter by mail to validate the claim. The mailing to Mr. Wingerter informed him that he had 30 days to dispute the claim if he wished to do so. No response was received from Mr. Wingerter. Two previous collection agencies had also attempted to collect from Mr. Wingerter, and he had never disputed the claim. This uncontradicted evidence was presented at the hearings by a Covenant employee.

B-Line, moreover, did not simply rest on Covenant's own research; the company conducted an additional review of its own before purchasing the Wingerter claim. Specifically, it reviewed all of the account information for obvious flaws, such as an invalid address or Social Security number. B-Line also compared the account information that it received from Covenant with the electronic records of the bankruptcy court, looking for discrepancies. And it conducted a search of various electronic databases to determine whether Mr. Wingerter had previously filed for bankruptcy. Only after going through this additional review did B-Line buy the claim from Covenant. B-Line then repeated its research after buying the claim and conducted further checks—ascertaining whether the bankruptcy case had been dismissed or converted to a different type of case, or whether the date for filing proofs of claim had passed. The company filed its proof of claim only at the conclusion of this lengthy evaluation.

With this combined research process, the warranties between B-Line and Covenant, and the highly reliable track record between them, B-Line clearly made a reasonable inquiry into the claim as required by Rule 9011(b). As the dissenting BAP judge put it, "the conclusion is inescapable that B-Line filed a proof of claim after conducting a reasonable inquiry under the circumstances." The bankruptcy court's conclusion that B-Line committed sanctionable conduct is therefore unwarranted. *See Davis v. Carl*, 906 F.2d 533, 536-37 (11th Cir. 1990) (noting that even weak evidence is generally enough to avoid sanctions, unlike a case where no evidence is presented to support the factual allegations).

We recognize, of course, that the Wingerters objected to B-Line's proof of claim, and that the company eventually withdrew the claim after being unable to find the supporting documentation. But the end result is irrelevant to a Rule 9011(b) determination. Controlling caselaw explains that "the bankruptcy court is not to use the benefit of hindsight" when considering the imposition of Rule 9011(b) sanctions. *See Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472, 481 (6th Cir. 1996) (citation and internal quotation marks omitted). Furthermore, although B-Line eventually discovered that it did not have enough information to prevail over the Wingerters' objection, this does not affect a Rule 9011(b) sanctions analysis. "Rule 9011 [does] not impose a continuing obligation on [a creditor] to obtain more information or revaluate its position as the case develop[s]." *Glatter v. Mroz* (*In re Mroz*), 65 F.3d 1567, 1574 (11th Cir. 1995).

Admittedly, as the bankruptcy court stressed, B-Line's proof of claim was submitted on an incomplete Form 10. This deficiency violated Rule 3001(c) of the Federal Rules of Bankruptcy Procedure, which requires that a proof of claim based on a writing include a copy of that writing. The ramifications for this type of violation are well-established, however, and do not result in sanctions. *See Heath v. Am. Express Travel Related Servs. Co., Inc.* (*In re Heath*), 331 B.R. 424, 433 (B.A.P. 9th Cir. 2005) (explaining that a failure to comply with Rule 3001 results in the creditor's proof of claim not being prima facie evidence of the claim's validity and amount). Not complying with Rule 3001 might be a factor in determining whether a Rule 9011(b) violation has occurred under different circumstances, but it is not a relevant factor in this case given the track record and warranties between Covenant and B-Line and the efforts that both businesses undertook to validate the Wingerter claim.

Finally, in light of what Rule 9011(b) requires before a court can impose sanctions, the bankruptcy court's categorical extrapolation of its holding—that the holder of an unscheduled, purchased claim will always have to attach copies of the claim's originating documents to its proof of claim or provide an explanation for their absence—is incorrect. Rule 9011(b) and this court's own precedents require bankruptcy courts, before imposing sanctions, to determine whether the specific conduct at issue was "reasonable under the circumstances" at the time the filing was submitted. *See Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 711 (6th Cir. 1999). Such an analysis does not lend itself to categorical prescriptions, but rather will depend on the varying facts of each case. B-Line's prefiling conduct in the present case was clearly "reasonable under the circumstances." This is especially so because Rule 9011(b) itself contemplates that a creditor does not have to have conclusive proof of the claim at the time of filing—that a good-faith belief based on a reasonable inquiry is sufficient if the "factual contentions . . . are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Bankr. P. 9011(b)(3).

In sum, we hold that the bankruptcy court abused its discretion in determining that B-Line's actions in this case violated Rule 9011(b) and were therefore sanctionable. *See Volvo Commercial Fin. LLC the Ams. v. Gasel Transp. Lines, Inc.* (*In re Gasel Transp.*

*Lines, Inc.*), 326 B.R. 683, 685 (B.A.P. 6th Cir. 2005) (explaining that a court abuses its discretion when, among other things, it "relies upon clearly erroneous findings of fact").

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the decisions of both the BAP and the bankruptcy court.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting.  Because B-Line lacked Article III standing to appeal the bankruptcy court judgment, the Bankruptcy Appellate Panel properly determined that it lacked jurisdiction over B-Line's appeal.  The requirements for Article III standing apply to the Bankruptcy Appellate Panel (BAP), even though the BAP is not an Article III court, because the power of the BAP is statutorily no greater than the power of a federal district court.  *See* 28 U.S.C. § 158(b).  I would therefore affirm the BAP's dismissal of B-Line's appeal.

The operative paragraph of the bankruptcy court's opinion stated:

> This Court finds that B-Line did not fulfill its Rule 9011 obligations in filing the B-Line [proof of claim] without having possession of the underlying transactional documents or any reliable proxy for such documents.  As a prospective matter, B-Line and other purchasers in the claims trading industry should understand that this Court views the filing, without review of originating documents, of a proof of claim by an assignee/purchaser to fall short of reasonable inquiry under Rule 9011 when the obligation has not been scheduled by the debtors and the purchase of the claim was not accompanied by reliable representations of claim validity.  Because of the time and energy that B-Line's senior management devoted in response to this Court's show cause order, however, the Court does not view any further sanctions to be necessary in this case.

*In re Wingerter*, 376 B.R. 221, 238 (Bankr. N.D. Ohio 2007).  The bankruptcy court's only holding is the refusal to impose sanctions upon B-Line.[1]  The judgment of the bankruptcy court was thus in favor of B-Line, and appellate courts "review[] judgments, not statements in opinions." *California v. Rooney*, 483 U.S. 307, 311 (1987) (quoting *Black v. Cutter Labs.*, 351 U.S. 292, 297 (1956)).  Because the judgment was in B-Line's favor, B-Line does not have the injury that is a prerequisite to standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  B-Line's only objection is to the

---

[1]The reference to "further" sanction apparently recognizes that the effort of responding to the show cause order itself created administrative costs for B-Line.  The costs of complying with the show cause order, however, are not sufficient for appellate standing.  As the BAP noted, any appeal of these costs is moot because an appellate court "cannot undo the show cause hearings now." *In re Wingerter*, 394 B.R. 859, 869 (B.A.P. 6th Cir. 2008).

statement, expressed as a "finding," that B-Line violated Rule 9011. But in the absence of a judgment sanctioning B-Line, this is merely a dictum. The judgment of the case—no sanctions—would be the same if the court had found that B-Line had not violated Rule 9011. "'There is no known basis for appealing a dictum,'" *Abbs v. Sullivan*, 963 F.2d 918, 924 (7th Cir. 1992) (Posner, J.) (quoting *Oxford Shipping Co. v. N.H. Trading Corp.*, 697 F.2d 1, 7 (1st Cir. 1982)), and thus no basis for appeal here.

This rule has sound foundations. Dicta do not cause parties constitutional injury—even if the dicta are unfavorable—because "[d]icta have no preclusive effect; even holdings do not; only judgments do." *Id.* at 924. The statement in the bankruptcy court opinion that B-Line violated Rule 9011 had no effect in the present case because no sanctions were imposed. The same statement has no legal effect on other cases involving B-Line because, as a dictum, it is not binding on B-Line and is neither preclusive nor even precedential authority for other courts. The statement might create some uncertainty for B-Line as to whether a future court might impose sanctions in some future case. Still, "[a]dverse dicta are not appealable rulings. They can cause harm, but not the sort of harm that the courts, in an effort to limit litigation, deem to create a genuine controversy within the meaning of Article III of the Constitution." *Chathas v. Local 134 IBEW*, 233 F.3d 508, 512 (7th Cir. 2000) (Posner, J.) (citations omitted). Surely B-Line preferred for the BAP to edit the bankruptcy court's opinion to state that no sanctions were warranted because B-Line did not violate Rule 9011, rather than in spite of the fact that B-Line did violate the rule. But having received a judgment of no sanctions, B-Line lacks standing to ask for such an appellate revision.

This conclusion is fully consistent with pre-enforcement judicial review of agency regulations. In cases such as *Abbott Laboratories v. Gardner*, 387 U.S. 136, 154 (1967), the Supreme Court has held that parties affected by agency rulemaking may bring suit to challenge regulations before they are enforced against regulated parties. Where an agency regulation "is directed at [a party] in particular" and where the regulation "requires [that party] to make significant changes in [its] everyday business practices," the party has standing because, if it "fails to observe [the regulation, the party

is] quite clearly exposed to the imposition of strong sanctions." *Id.* Agency regulations are capable of requiring action by parties because such regulations "have the status of law and violations of them carry heavy criminal and civil sanctions." *Id.* at 152. Bankruptcy courts, by contrast, do not have the type of rulemaking power that would allow them to issue binding prospective regulations. *See* 28 U.S.C. §§ 151, 157. Unlike an agency regulation, the bankruptcy court's statement in the present case regarding the rule it plans to apply "as a prospective matter" does not of its own force legally require any action by B-Line because the statement does not have the status of law. Only the bankruptcy court's judgment has that kind of status. Because the bankruptcy court's only legally binding action in this case—its decision not to impose sanctions—was not adverse to B-Line, B-Line lacks the standing that it might have had if the bankruptcy court had possessed and exercised prospective rulemaking power.

It is true that the Supreme Court has recognized one exception to the rule that appellate courts review judgments, not opinions, but that exception is not applicable in this case. In *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 241-42 (1939), a district court found that a patent was valid but that the plaintiff had failed to prove infringement. The defendant appealed, arguing that the district court had erred in finding that the patent was valid. *Id.* at 242. The Supreme Court, while noting that the adjudication of the patent's validity "was immaterial to the disposition of the cause," held that there was appellate jurisdiction "not for the purpose of passing on the merits, but to direct the reformation of the decree." *Id.* This court, in *R.T. Vanderbilt Co. v. Occupational Safety and Health Review Commission*, 728 F.2d 815, 817 (6th Cir. 1984), clarified that the holding from *Electrical Fittings* rested on the Supreme Court's perception that "a finding of patent validity . . . might significantly affect the behavior of third parties concerned about the patent's worth." In *R.T. Vanderbilt*, we relied on *Electrical Fittings* to reject an argument that a talc manufacturer lacked constitutional standing to appeal a finding by the Occupational Safety and Health Review Commission that its talc product contained asbestos fibers, even though the Review Commission's disposition had been that one of the talc manufacturer's customers was not liable because

it did not have reason to know about the asbestos. *Id.* at 816-17.**2** In the present case, by contrast, there is no evidence that B-Line's reputation or relationships with third parties would be damaged. Further, as Judge Ryan noted while writing for a majority of the panel in *ASARCO, Inc. v. Secretary of Labor*, 206 F.3d 720 (6th Cir. 2000), an appellant "cannot invoke the *Electrical Fittings* exception to achieve . . . a review . . . *on the merits*," as *Electrical Fittings* "permits only the more limited remedy of reforming a judgment by deleting the allegedly erroneous portions." *Id.* at 725 (Ryan, J., concurring) (emphasis in original). Like the appellant in *ASARCO*, B-Line seeks in the present case a reversal of the bankruptcy court on the merits, and the majority in this case orders such relief. The *Electrical Fittings* exception flatly does not support such relief.

Some of our sister circuits have recognized an additional exception to the rule that appellate courts review judgements, not statements in opinions. This exception applies in cases in which an attorney's reputation is damaged by trial court findings that the attorney engaged in sanctionable conduct. Even if this court were to recognize this exception, it would not apply to the present case because B-Line asserts no reputational interest in this appeal. The Sixth Circuit has not yet addressed the extent to which court opinions stating that an attorney has engaged in improper behavior can be appealed. *See United States v. Barnett (*In re *Harris)*, 51 F. App'x 952, 956 (6th Cir. 2002) (unpublished). Among the circuits that have addressed the issue, not every circuit allows attorneys to appeal statements that they committed sanctionable conduct in the absence of a monetary fine. The Seventh Circuit has "recognized that an attorney can bring an appeal on her own behalf when challenging a district court decision imposing monetary sanctions on the attorney, but this rule does not allow an appeal of otherwise critical comments by the district court when no monetary sanctions have been imposed." *Seymour v. Hug*, 485 F.3d 926, 929 (7th Cir. 2007). Among the circuits that do allow appeals of statements critical of attorneys in the absence of a fine, at least one allows an appeal only where the statement is "expressly identified as a reprimand." *See Williams*

---

**2**This reasoning itself was not necessary to our decision in *R.T. Vanderbilt*, as we ultimately held that the talc manufacturer lacked prudential standing.  728 F.2d at 818.

*v. United States (*In re *Williams)*, 156 F.3d 86, 92 (1st Cir. 1998).  Under either of these two rules, B-Line would clearly lack standing, as the bankruptcy court did not impose any monetary sanctions and did not expressly identify its finding as a reprimand.

The remaining circuits that have addressed the issue allow appeals of findings that attorneys have engaged in sanctionable conduct because such findings injure the reputation of the attorneys.  *See, e.g.*, *Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163, 1167 (10th Cir. 2003).  In *Butler*, for example, an attorney appealed "portions of a district court order that found him to have committed 'ethical violations,'" even though "this order neither expressly identified itself as a reprimand nor imposed any sanction, monetary or otherwise."  *Id.*  (The order was, however, mailed to every court in which the attorney had been admitted to practice.  *Id.*)  The court held that the attorney had standing because "damage to an attorney's professional reputation is a cognizable and legally sufficient injury."  *Id.* at 1168.  This rationale also does not apply to B-Line, which asserted no reputational interest in the appeal to the BAP.

B-Line's lack of reputational interest also renders *Sterling Consulting Corp. v. IRS (*In re *Indian Motocycle Co., Inc.)*, 452 F.3d 25 (1st Cir. 2006), not applicable to the present appeal.  *Sterling* did not expand the exception allowing appeals of findings that parties had engaged in sanctionable conduct; rather, *Sterling* held that a sanctioned party had standing in a case where two additional criteria were satisfied.  First, the *Sterling* court applied the First Circuit rule that court statements that a party's conduct is sanctionable are appealable only if the statements "are expressly identified as a reprimand."  *Id.* at 29 (internal quotation marks omitted) (citation omitted).  Second, the court held that even where a party's reputation is damaged, and even where the trial court expressly identified its statements as a reprimand, standing is without question only where the challenged sanction order *also* "continues to have a potential real-world impact upon the sanctioned party."  *See id.* at 30.  If this court were to adopt and apply *Sterling*, then B-Line would lack standing both because B-Line asserted no reputational interest in its BAP appeal and because the order in this case was not expressly identified as a reprimand.

Finally, even if this court chose not to apply the rule that appellate courts "review[] judgments, not statements in opinions," *Rooney*, 483 U.S. at 311, B-Line still cannot show that it has suffered an injury in fact sufficient to grant it standing under Article III. *See Lujan*, 504 U.S. at 560. The existence of the bankruptcy court order has two plausible negative effects on B-Line, neither of which rises to the level of an injury in fact.

First, if B-Line is correct that its actions were not improper, then it is arguably injured because it may have to litigate this issue again in a future case. This court, however, has previously held that the possible cost of litigating an issue a second time is not sufficient to grant a party standing. In *ASARCO*, the Mine Safety and Health Administration (MSHA) cited ASARCO for violating mine dust standards. 206 F.3d at 721. An administrative law judge (ALJ) vacated the citation because the MHSA laboratory's procedures were inadequate, but the ALJ separately determined, over ASARCO's objections, that it was acceptable for MSHA to rely on dust samples collected from a single mine shaft when issuing citations. *Id.* ASARCO sought to appeal this determination, first to the Federal Mine Safety and Health Review Commission and then to this court. *Id.* Noting that "[a]ppellate courts review judgments, not statements in an opinion," we held that ASARCO lacked standing because "[t]he only damage to ASARCO is, perhaps, the cost it may incur in repeating the litigation of the single-sampling issue in the future, if it is cited for a violation, if the citation rests on a single-shift sample, and if the citation is upheld by an ALJ." *Id.* at 722, 723-24 (emphasis omitted). Similarly, if B-Line is correct that its conduct is not sanctionable, then the only damage to B-Line is, perhaps, the cost B-Line may incur in re-litigating the sanctions issue if a future court sanctions B-Line for violating Rule 9011. As in *ASARCO*, "[t]his is a highly speculative injury, too much so to count as the 'Article III minima of injury in fact' required for standing." *Id.* at 724 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).

Second, B-Line is arguably injured because the uncertainty created by the bankruptcy court opinion may deter B-Line from engaging in its regular business

practices. But every uncertainty in the law can injure parties in this manner. A rule recognizing such uncertainty as an injury for the purposes of Article III would destroy the rule against advisory opinions. The fact that the injury here is caused by an unfavorable dictum does not alter this result. A party could not sue in federal court on the theory that dicta in a previous Supreme Court case—even a case involving that party—are deterring the party from engaging in a given business practice and ask this court to clarify the state of the law. Uncertainty, like unfavorable dicta and the possibility of future re-litigation, is an insufficient basis for Article III standing. Having no other injury, B-Line lacked standing to appeal to the BAP, and the BAP properly dismissed the appeal.